# In the United States Court of Federal Claims

No. 21-1354 C
Filed Under Seal: June 28, 2021
Reissued: July 21, 2021[*]

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                                    *
CW GOVERNMENT TRAVEL, INC.                          *
A/K/A CWTSATOTRAVEL,                                *
                                                    *
                    Plaintiff,                      *
                                                    *
        v.                                          *
                                                    *
THE UNITED STATES,                                  *
                                                    *
                    Defendant,                      *
                                                    *
and                                                 *
                                                    *
BCD TRAVEL USA, LLC,                                *
                                                    *
                    Defendant-Intervenor.           *
                                                    *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Lars E. Anderson*, with whom were, *Sally A. Hostetler*, *Charlotte R. Rosen*, and *James P. Miller*, Odin, Feldman & Pittleman, of Reston, VA, for plaintiff.

*Robert C. Bigler*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were, *Eric P. Bruskin*, Assistant Director, *Martin F. Hockey, Jr.*, Acting Director, and *Brian M. Boynton*, Acting Assistant Attorney General, all of Washington, D.C., for defendant, and *Jeremiah M. Strack*, Senior Assistant General Counsel, Office of General Counsel, LPNA, U.S. General Services Administration, of Washington, D.C., of counsel.

*Timothy A. Furin*, Apple & Furin, LLP, of Austin, TX, for defendant-intervenor.

---

[*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties provided proposed redactions of confidential or proprietary information. The resulting redactions are shown by asterisks enclosed by brackets. In addition, the Court made minor typographical and stylistic corrections.

## OPINION AND ORDER

**SOMERS**, Judge.

On May 13, 2021, Plaintiff, CW Government Travel, Inc. ("CWT" or "CWTSatoTravel"), filed a motion for a temporary restraining order and a preliminary injunction seeking to enjoin further performance of a task order awarded to BCD Travel USA, LLC ("BCD" or "BCD Travel") by the General Services Administration ("GSA") pursuant to Request for Quotation No. 47QMCB20Q0010 ("RFQ"), for Department of Defense, U.S. Army CONUS, Travel Management Company services ("Army travel contract"). Given that the Administrative Record has been filed, no supplementation of the Administrative Record has been requested, Plaintiff's grounds for protest have been fully briefed and argued, and the parties have stated that they have no objection,[1] pursuant to Rule 65(a)(2) of the Rules of the Court of Federal Claims ("RCFC"), the Court is consolidating Plaintiff's motion for a preliminary injunction with its request for a permanent injunction and for judgment on the administrative record.

For the reasons that follow, the Court has determined that GSA, in evaluating quotations and determining to which travel management company to award the Army travel contract, failed to follow a material requirement in the RFQ related to key personnel and did not conduct the price realism and unbalanced pricing analyses it was required to perform. Therefore, the agency's evaluations of technical approach and price were not conducted in accordance with the RFQ's requirements. Moreover, these material failures to follow the terms of the RFQ prejudiced Plaintiff. Accordingly, Plaintiff is entitled to judgment on the administrative record, and Plaintiff's request for a permanent injunction is granted.

## BACKGROUND AND PROCEDURAL HISTORY

### A. The Solicitation

On May 13, 2020, the government, acting through GSA, on behalf of the Department of Defense, issued an RFQ requesting quotes from companies to provide Travel Management Company ("TMC") services for the Army within the continental United States. AR Tab 2. In order to compete for the award, a company was required to already be listed on the GSA Multiple Award Schedule under Category L – Travel, Special Item Number (SIN) 561510 Travel Agent Services. The RFQ stated that GSA would award the task order on a best value basis. AR 123. The following factors were to be used by GSA to evaluate quotes:

> Factor A – TMC Passenger Name Record (PNR) Validation
> Factor B – Technical Approach
> Factor C – Past Performance
> Factor D – Small Business Participation
> Factor E – Price

---

[1] Plaintiff did note some objection at oral argument to consolidating the preliminary injunction with permanent relief; however, Plaintiff's objection was limited to one of its lines of argument and then only if the Court decided that issue in the government's favor. As is explained below, the Court sides with Plaintiff on the issue; therefore, Plaintiff has made no relevant objection to consolidation.

AR 384.

Factor A, TMC Passenger Name Record Validation, was evaluated on a Pass/Fail basis. AR 124.  Factor B, Technical Approach, was based on five criteria: (1) technical approach; (2) corporate experience; (3) implementation and transition; (4) central billing account; (5) key personnel plan; and (6) qualification of key personnel.  AR 124-126.  Technical Approach was rated on an adjectival basis as Outstanding, Good, Acceptable, Marginal, or Unacceptable, as described in the following chart:

| Technical Ratings | |
|---|---|
| **Rating** | **Description** |
| Outstanding | Quote meets requirements and indicates an exceptional approach and comprehensive understanding of the requirements.  The quote contains multiple strengths and no weaknesses or deficiencies.  The quote is considered to be very low to no risk to the Government. |
| Good | Quote meets requirements and indicates a thorough approach and understanding of the requirements.  Quote contains at least one strength and no deficiencies. Weaknesses, if any, are more than offset by strengths. The quote is considered to be a low risk to the Government. |
| Acceptable | Quote meets requirements and indicates an adequate approach and understanding of the requirements.  Quote has no deficiencies.  Weaknesses, if any, are generally offset by strengths.  The quote is considered to be a moderate risk to the Government. |
| Marginal | Quote does not clearly meet requirements, and has not demonstrated an adequate approach and understanding of the requirements.  Quote contains at least one deficiency and weaknesses are not offset by strengths.  The quote is considered to be a significant risk to the Government. |
| Unacceptable | Quote does not meet requirements and contains numerous weaknesses and/or deficiencies and is unawardable. |

AR 385.  In addition, the definitions for the terms used in the technical ratings chart are as follows:

| | **Standard Definition** |
|---|---|
| **Strength** | A strong attribute or quality of particular worth or utility; an inherent asset.<br><br>Note: Simple adherence to the requirements or ability to meet a requirement is compliance but should not be listed as a strength |
| **Weaknesses** | A flaw in the quote that increases the risk of unsuccessful contract performance |

3

| Deficiency | A material failure of a quote to meet a Government requirement or a combination of significant weaknesses in a quote that increases the risk of unsuccessful contract performance to an unacceptable level. |
|---|---|

AR 124.

Factor C, Past Performance, was evaluated based on: (1) success in providing TMC services; (2) degree to which these evaluations of past performance reflect a history of customer satisfaction and collaboration; and (3) extent to which applicable goals and other small business performance objectives/requirements were met for any awarded contracts that required submission of a Small Business Participation Plan, Subcontracting Plan, or other small business participation/utilization document.  AR 386.  Past Performance was rated on an adjectival basis as Outstanding, Good, Acceptable, Neutral, or Unacceptable, as described in the following chart:

| Outstanding | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. Performance was rated **<u>exceptional</u>** in the majority of categories reviewed. |
|---|---|
| Good | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires.  Performance was rated **<u>very good</u>** in the majority of categories reviewed. |
| Acceptable | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. Performance was rated **<u>satisfactory</u>** in the majority of categories reviewed. |
| Neutral | The Contractor does not have a record of relevant past performance or information on past performance is not available.  No recent/relevant performance record is available. |
| Unacceptable | Present/past performance involved little or none of the scope and magnitude of effort and complexities this solicitation requires and no other information is available.  Performance was rated **<u>marginal</u>** or **<u>unsatisfactory</u>** in the majority of categories reviewed. |

AR 127.

Factor D, Small Business Participation, was evaluated on an Acceptable/Unacceptable basis.  Finally, Factor E, Price, required that offerors submit price quotes for both Point of Sale ("POS") and Management Service Fee ("MSF") pricing, as GSA was to determine at the time of award which of the two pricing models it was going to utilize.

The RFQ also specified that "[t]he Government will take into consideration any unbalanced pricing," and any offeror's "overall price that is excessively high or low (without sufficient justification) may be considered unrealistic and unreasonable and may receive no

4

further consideration." AR 128.  In addition, the RFQ provided that the Army travel contract would be awarded on a best value basis as follows:

> Award of this task order will be made on a competitive basis, in accordance with FAR 8.405-2(d), using best value to the responsible Offeror which provides the most advantageous solution to the Government.  The Government may elect to award to other than the lowest priced Offeror, or other than the highest technically rated Offeror. In either case, a trade-off determination will be conducted.  The Government is more concerned with obtaining superior technical features than with making award at the lowest price to the Government. However, the Government will not make an award at a significantly higher overall price to the Government to achieve slightly superior technical features.

AR 123.

## B.  Award Decision and First GAO Protest

Three offerors submitted quotes for the Army travel contract: Plaintiff, which is one of the incumbent contractors, Omega Travel, which is the other incumbent contractor, and BCD Travel.  AR Tabs 12, 13, 46.  After evaluations and discussions, on September 18, 2020, GSA awarded the contract to BCD Travel.  AR Tabs 24-26.  BCD Travel quoted the government a price of $46.8 million for POS pricing and $43.7 million for MSF pricing to fulfill the contract; Plaintiff quoted the government prices of $53.6 million under the POS model and $53.7 million under the MSF model.  AR 1945.  BCD Travel was rated "Outstanding" in both Past Performance and Technical Approach; Plaintiff was rated "Outstanding" in Past Performance and "Good" for Technical Approach.  AR 1942.  On September 25, 2020, Plaintiff challenged the contract award by filing a bid protest with the Government Accountability Office ("GAO").  AR Tab 28.

## C.  Agency Corrective Action, Partial Re-Evaluation, Re-Award, and Second GAO Protest

On account of Plaintiff's allegations in its original GAO bid protest, on November 13, 2020, GSA informed GAO and the offerors that it would re-evaluate BCD Travel's quote and make a new source selection decision.  AR Tab 32.  Thereafter, GSA re-convened its Technical Evaluation Team ("TET").  AR Tab 35.  In its revised evaluation, dated December 17, 2020, GSA downgraded BCD Travel's ratings for both technical approach and past performance from "Outstanding" to "Good."  AR 2552-2553.  BCD Travel, however, was still awarded the contract due to its lower quoted price.  AR Tab 37.  On January 7, 2021, Plaintiff again filed a bid protest at GAO challenging the award to BCD Travel after the re-evaluation.  AR Tab 40.  In this protest, Plaintiff alleged, among other grounds, that BCD Travel's key personnel do not possess the mandatory minimum qualifications, BCD Travel's price is unrealistic and unbalanced and GSA failed to perform an adequate price evaluation, and GSA engaged in unfair and inequitable discussions.  AR 2567.  On April 15, 2021, GAO denied Plaintiff's second challenge.  AR Tab 45.  Accordingly, on May 13, 2021, Plaintiff filed the instant action and moved for a temporary restraining order and preliminary injunction.

### D.  The Current Protest

In its protest in this Court, Plaintiff alleges that GSA committed four errors in evaluating the quotations for the Army travel contract:

1. Most of BCD Travel's key personnel did not meet the professional experience required in the RFQ and thus GSA "violated the plain language" of its own solicitation in awarding the contract to BCD Travel.

2. The overall price quoted by BCD Travel was unrealistic and BCD Travel's quote contained unbalanced pricing, both for which GSA failed to conduct a rational price evaluation.

3. BCD Travel's past performance rating was higher than it should have been under the terms of the RFQ regarding the scope, magnitude, and complexity of past performance.

4. GSA corrected incomplete information in BCD Travel's proposal yet failed to extend the same "courtesy" to Plaintiff, thereby disparately treating the two offerors.

As a result of these alleged errors, Plaintiff claims GSA failed to evaluate proposals in accordance with the RFQ and applicable law, and these alleged errors caused GSA to overlook deficiencies in BCD Travel's quote.  Plaintiff further asserts that but for GSA's errors it had a substantial chance of being awarded the Army travel contract, and it will be irreparably harmed if the Court does not enjoin further performance of the contract.

### DISCUSSION

### A.  Legal Standard

The Tucker Act provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  In such actions, the Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4). Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706.

Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted).  On the first ground, "the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Id.* (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its

exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id*. at 1332-33 (citations and quotes omitted).  On the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id*. at 1333 (citation and quote omitted).

In addition, "[t]o prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).  To establish prejudice, a plaintiff is "required to show that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors in the bid process." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (citations omitted).

## B.  Plaintiff Has Standing

To sustain a bid protest action in this Court, a protestor must first establish that it has standing.  In bid protests, standing is framed by 28 U.S.C. § 1491(b)(1), which "imposes more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  Bid protest standing "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).  Accordingly, to proceed in a bid protest, a plaintiff "is required to establish that it '(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest.'" *Weeks Marine, Inc.*, 575 F.3d at 1359 (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)).  "To prove a direct economic interest as a putative prospective bidder, [the bidder] is required to establish that it had a 'substantial chance' of receiving the contract." *Rex Serv. Corp.*, 448 F.3d at 1308; *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process.").

Plaintiff has established that it has standing to bring the instant protest.  First, it is undisputed that Plaintiff is an actual bidder.  *See* AR Tab 13.  Second, Plaintiff clearly had a "substantial chance" of receiving the award but for the alleged errors in the procurement process.  As is discussed in more detail below concerning prejudice, Plaintiff was at least next in line— and in some respects first in line—for the award.  In reviewing the three quotes received, GSA's Price Evaluation Team ("PET") "recommend[ed] awarding to [Plaintiff] since there were no deficiencies or risks identified" in its evaluation.  AR 1666.  Later, in the agency's award re-evaluation, the Contracting Officer makes clear that the decision came down to Plaintiff, which was one of the incumbent contractors, and BCD Travel.  *See* AR 2560 ("In reviewing the evaluation of the quotes submitted by BCD Travel and [Plaintiff], the only differences in evaluations between the two companies are [Plaintiff's] higher rating in past performance and BCD's lower price in performance of this effort.").  This more than suffices to prove Plaintiff's direct economic interest.  Accordingly, Plaintiff has standing to maintain this action.

**C.  Plaintiff Is Entitled to Judgment on the Administrative Record**

On the merits, Plaintiff makes four arguments as to why it was prejudiced by GSA decisions that were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, therefore, is entitled to judgment on the administrative record.  As is explained below, given all the disputed and undisputed facts, the Court finds that Plaintiff has met its burden on two of its four arguments, namely its arguments related to key personnel and unrealistic and unbalanced pricing.  For the Court, as it relates to these arguments, the issue is whether GSA effectively disregarded material terms of the RFQ regarding the experience required for key personnel and whether it failed to conduct the required analyses for the realism of the overall prices and the reasonableness of the quoted line items.  The Court acknowledges that GSA may be correct that BCD Travel can acceptably perform the Army travel contract and may even perform it well.  That assessment by GSA, however, did not relieve it of its obligation to follow the terms of its RFQ in determining which quote presented the best value to the government.

In other words, GSA could have made the choice to refrain from placing particular experience requirements in the RFQ for key personnel and obligating itself to perform a price realism analysis.  However, once it placed those requirements in the RFQ, it was required to either follow them or amend the RFQ to eliminate them.  48 C.F.R. § 15.206(a), (d) (requiring the government to amend the solicitation when it "changes its requirements or terms and conditions," or "[i]f a proposal of interest to the Government involves a departure from the stated requirements"); *see also, e.g.*, *Alfa Laval Separation, Inc.*, 175 F.3d at 1367-68 ("[R]egardless of the panel's view of the appropriateness of the standard set out in the RFP, the Navy is strictly bound by its terms, and in waiving a portion of the standard . . . the Navy violated a clearly applicable procurement statute and regulation.") (internal quotation marks omitted).  In addition, the Federal Acquisition Regulations ("FAR") and the RFQ required GSA to analyze the quotes for unbalanced pricing.  Instead, as is more fully explained below, it appears GSA, in awarding the contract to BCD Travel, chose to ignore the FAR and a material requirement in the RFQ.  This it was not permitted to do.

**1.  GSA Failed to Apply the RFQ's Key Personnel Experience Requirement**

The RFQ contained specific requirements with regard to the professional experience of the key personnel required under its terms.  At issue in this protest, as it relates to key personnel, is the requirement that most of the key personnel have "U.S. Government travel experience."  AR 88.  The RFQ required that the Program Manager have "[t]en years of commercial travel experience, with five (5) years of *U.S. Government travel experience*," the Operations Manager have "[t]en years of commercial travel experience, with five (5) years of *U.S. Government travel experience*," the Quality Control Manager have "[f]ive (5) years of commercial travel experience," the Site Managers have "[f]ive (5) years of commercial travel experience, with two (2) years *U.S. Government travel experience*," and the Chief Information Systems Security Officer have a "[m]inimum of five (5) years managing TMC system security compliance."  AR 88-89 (emphasis added).

According to Plaintiff, the Program Manager, Operations Manager, and Site Managers proposed by BCD Travel did not possess the requisite "U.S. Government travel experience." This is because, according to Plaintiff, the term "U.S. Government travel experience," as used in the RFQ, means experience managing and booking travel for U.S. Government personnel.  ECF No. 4 at 7-11 ("Pl.'s Mot. for TRO/PI").  Yet, Plaintiff argues, with the exception of one individual, the key personnel BCD Travel included in its quote do not have experience managing and booking travel for U.S. Government personnel.  Conversely, GSA asserts that the term has a broader meaning.  Rather than being limited to experience managing and booking travel for U.S. Government personnel, GSA argues that the term also includes experience booking travel for aerospace and defense contractors traveling at the government's expense.  ECF No. 28 at 13-16 ("Gov.'s Resp."); *see also* AR 2543.  In short, as it relates to key personnel, Plaintiff's argument is a matter of contract interpretation.

### a.  *GSA's interpretation of the term "U.S. Government travel experience" is unreasonable*

Interpretation of the terms in a solicitation is a question of law over which this Court exercises *de novo* review without deference to an agency's interpretation.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  The Court's interpretation of a solicitation's terms begins with the plain language of the document, *see, e.g.*, *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc), which "must be given that meaning that would be derived from the [solicitation] by a reasonably intelligent person acquainted with the contemporaneous circumstances," *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) (internal quotation marks omitted).  "[A]ny subjective, unexpressed intent of one of the parties is ineffective."  *Sterling, Winchester & Long, L.L.C. v. United States*, 83 Fed. Cl. 179, 183 (2008).  Moreover, the solicitation "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts."  *NVT Techs.*, 370 F.3d at 1159.  Such an interpretation "is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."  *Id*. (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

The question then is whether the term "U.S. Government travel experience" plainly supports only one reasonable meaning or whether it supports more than one reasonable meaning and is, therefore, ambiguous.  "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term.  Rather, both interpretations must fall within a 'zone of reasonableness.'"  *Metric Constructors, Inc*., 169 F.3d at 751 (citations omitted).  Both Plaintiff and the government argue that there is no ambiguity because their respective interpretation of the term is reasonable, while the other party's interpretation is unreasonable.

Based on a reading of the RFQ as a whole, the Court concludes that the plain language of the RFQ does not support GSA's interpretation of the term "U.S. Government travel experience."  Instead, the Court believes that, rather than being reasonable, GSA's interpretation of the term, and the application of its interpretation with regard to the RFQ, is unreasonable as it invites confusion and uncertainty into an otherwise straightforward RFQ requirement.

On its face, the term "U.S. Government travel experience" seems plainly to mean experience managing and booking travel for government personnel at government expense. This seemingly straightforward interpretation is confirmed by the language and purpose of the RFQ as a whole. First, the contract to be awarded is for travel by U.S. government personnel, namely travel within the continental United States by uniformed and civilian personnel of the Army. It does not contemplate the awardee supplying travel management services to Army contractors. Because the RFQ is for travel management services for U.S. Government personnel travel, it is obvious that experience managing and booking such travel is the very type of experience that GSA desired key personnel servicing the contract possess. Although experience with travel management generally, or government contractor travel specifically, may also have been valuable experience to GSA, such travel experience is clearly covered by the more general requirement that the proposed key personnel have "commercial travel experience." AR 88.

Second, the RFQ specifically limits which companies were permitted to submit quotations for the Army travel contract. Only GSA contractors that are listed on the Multiple Award Schedule for Category L – Travel were permitted to submit quotes. AR 23. This limitation restricted bidding to at most four travel management companies out of the entire universe of travel management companies.[2] Importantly, this GSA MAS category is for federal government agencies to purchase travel agent and other travel services for government personnel travel. It would seem illogical and, more importantly, render this limitation useless, inexplicable, or superfluous, if GSA placed this limitation in the RFQ but then allowed the resulting contract to be staffed with key personnel who had no experience managing and booking this sort of travel. Stated differently, GSA by its own determination limited the submission of quotes to four companies that already have indefinite delivery, indefinite quantity contracts with the federal government to provide travel services to government personnel; therefore, reading the term "U.S. Government travel experience" in light of this strict limitation, its plain meaning must only include experience managing and booking travel for government personnel. Otherwise, the strict MAS category limitation appears to be irrational.

Third, the term "Government travel" is used as an adjective in multiple other places in the RFQ to limit other terms in a manner that is consistent with this interpretation of "U.S. Government travel experience." The most important of these uses is with regard to "Government travel policy," which the RFQ clearly limits to travel pursuant to the Joint Travel Regulation. AR 25. Notably, travel under the Joint Travel Regulation does not include government contractor travel.[3] In other words, the term "Government travel policy" is consistent with the interpretation of "U.S. Government travel experience" offered by Plaintiff but is wholly

[2] GSA's memorandum regarding its decision to consolidate the Army's current travel management contracts into the one contract that is the subject of this protest explained that there are only 22 vendors under the Multiple Award Schedule (MAS), Category L – Travel of which 14 are small businesses. GSA went on to explain that small businesses were not capable of handling the Army travel contract. AR 10 ("[U]ltimately [GSA] determined that none had the capability to handle the large volume of transactions anticipated for the Army requirement."). In total, GSA concluded that four vendors were capable of handling the travel needs and complexity of the Army travel contract. *Id*.

[3] The Joint Travel Regulation does appear to cover travel by personal services contractors. However, personal services contractors have an employer-employee relationship with the agency that contracts with them and in many respects appear to be employees of that agency. In any event, the travel management experience at issue in this protest with regard to government contractors does not involve contracts for personal services.

10

inconsistent with the interpretation urged by GSA, which includes contractor travel. Another similar use of "Government travel" as an adjective occurs with the term "Government travel programs." Importantly, with regard to interpreting the meaning of the term "U.S. Government travel experience," all of the "Government travel programs" listed in the RFQ are limited to use for government employees, not contractors—again making this term consistent with Plaintiff's interpretation and inconsistent with that of GSA. AR 25.

Conversely, GSA's purported interpretation of "U.S. Government travel experience" is unreasonable. To begin with, if the Court were to find GSA's interpretation reasonable, it would make the experience requirement for key personnel ambiguous, whereas Plaintiff's interpretation leaves the requirement clear. This is because, under GSA's interpretation of the term, it is entirely unclear what type of government contractor experience counts as "U.S. Government travel experience." Is it only aerospace and defense contractor travel experience that counts? What about non-defense contractor travel experience? Does the experience have to be with cost reimbursable government travel or will any travel management experience with government contractors suffice? What if the experience is with a defense contractor, but the travel services provided were for private, non-government work or foreign or state government work? These are just a sampling of the many questions raised by GSA's proffered interpretation.

The past performance references BCD Travel listed in its quote and GSA's discussion of them are especially illustrative of this point. BCD Travel submitted three government contractors for its past performance evaluation: Raytheon, Federal Express, and Apple. Yet, GSA's explanation for why BCD Travel's government contractor experience counts as "U.S. Government travel experience" focuses solely on Raytheon, an "aerospace and defense" contractor: "the years of experience the Offeror's key personnel served in Aerospace & Defense meet the Government's requirements." AR 2543. But what about Federal Express and Apple? Both companies are also government contractors. Apparently, under GSA's interpretation, only some government contractor travel experience counts as "U.S. Government travel experience," while other government contractor travel experience does not. This sort of ambiguity makes GSA's interpretation unworkable and, therefore, unreasonable.

Moreover, the rationale that GSA offered for why government contractor travel experience counts as "U.S. Government travel experience" is factually incorrect. According to GSA,

Aerospace & Defense Contractors traveling at Government expense are required to follow many of the same rules that government DoD employees for transportation, lodging, meals and incidentals, which include but are not limited to the Fly America Act, adherence to preferred programs (e.g. lodging, rental car, airlines), per diem, MI&E, usage of economy class for air/rail, etc. Therefore, the years of experience the Offeror's key personnel served in Aerospace & Defense meet the Government's requirements in 1.18.2.

AR 2543. The problem with this rationale, as Plaintiff points out, is that it is incorrect. In its reply brief Plaintiff asserts, and the government does not rebut, that,

aerospace and defense contractors under Government cost reimbursable contracts are not required to follow the same rules that apply to official travel by Government personnel in regard to transportation, lodging, meals and incidentals, and such contractors cannot utilize or adhere to Government preferred programs for air/rail travel, lodging, and meals. Even the per diem requirements for contractor travel under cost reimbursable contracts differs significantly from the per diem requirements for Government travelers.

ECF No. 32 at 5-6 ("Pl.'s Reply").

GSA's interpretation is unreasonable because, contrary to GSA's tortured rationale, a reasonably intelligent person acquainted with the RFQ would not think that "U.S. Government travel experience" included government contractor travel experience. The term "U.S. Government travel experience" would be rendered almost meaningless if government contractor travel experience is interpreted to satisfy the requirement.

In addition, the government's attempt to make Plaintiff's interpretation of "U.S. Government travel experience" appear unreasonable is unavailing. To start with, GSA asserts that Plaintiff's interpretation would be "restrictive" and "anti-competitive" because very few contractors, if any, other than Plaintiff, would qualify if Plaintiff's interpretation were reasonable. But it is not Plaintiff's interpretation that makes the RFQ "restrictive" and "anti-competitive." Rather, GSA itself placed restrictive and arguably anti-competitive barriers in the RFQ by limiting quotes to four companies on GSA's Multiple Award Schedule for travel agent services and including a requirement that key personnel have "U.S. Government travel experience." If GSA did not want to so restrict competition, its choice was to avoid placing restrictive or anti-competitive requirements in the RFQ in the first place or to remove them through amendment if it discovered the requirements were undesirably restricting competition. Casually ignoring or unreasonably interpreting RFQ requirements, however, was not a permissible option available to GSA.

Finally, the government argues that Plaintiff's interpretation of "U.S. Government travel experience" conflates the term with another term that is defined in the RFQ: "official travel." Thus, the government argues that if the RFQ meant "official travel" experience, GSA would have used that term instead of "U.S. Government travel experience." The problem with the government's argument is that the RFQ does not use the term "official travel" consistently in each instance that a term in the RFQ actually means "official travel." Rather, the RFQ regularly uses other terms in place of the defined term "official travel." For example, a quick search through the RFQ for the word "official" reveals the following terms other than "official travel" being used to mean "official travel": "official duty," "official business," "official transportation," "official DoD travel," "official transportation services," "official lodging and rental car reservations," "official Government travel," "official DoD travelers," and "official trips." When read in context, in each of these instances, if the government's argument was correct, the term "official travel" would have been used in place of all of these terms. Moreover, it is beyond peradventure that if the Court re-read the entire solicitation looking just for this type of term substitution, it would find more examples of other terms or phrases being used in place of "official travel."

In sum, the Court does not find the term "U.S. Government travel experience" ambiguous. The term, as used in the RFQ, means experience providing travel management company services for U.S. government personnel. Furthermore, the Court finds GSA's interpretation of the term unreasonable.

### b. *Plaintiff was prejudiced by GSA's unreasonable interpretation*

It is not enough, however, that Plaintiff show that GSA misinterpreted the requirements of the RFQ with regard to key personnel. Plaintiff must also demonstrate that the misinterpretation prejudiced it. *See, e.g.*, *Info. Tech. & Applications Corp.*, 316 F.3d at 1319 ("To establish prejudice, [plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."). Plaintiff makes two arguments with regard to how it was prejudiced by GSA's misinterpretation of the key personnel requirement: (1) that the key personnel requirement was a mandatory minimum requirement of the RFQ; that by using an unreasonable definition of "U.S. Government travel experience," GSA overlooked BCD Travel's failure to meet this mandatory minimum; and that, had GSA used the proper interpretation, BCD Travel's quote would have been disregarded and the contract awarded to Plaintiff; or (2) alternatively, that the key personnel requirement was a criteria for the technical approach evaluation and by failing to meet the key personnel requirement, the highest rating BCD Travel could have received on the technical approach evaluation was "Marginal." As to this second argument regarding BCD Travel's technical approach rating, Plaintiff further argues that, were BCD Travel rated as "Marginal," it is significantly unlikely BCD Travel would have been awarded the contract over Plaintiff.

Plaintiff's second argument is the stronger one. BCD Travel received a "Good" rating on its technical approach evaluation. For this RFQ, a "Good" rating was described as: "Quote meets requirements and indicates a thorough approach and understanding of the requirements. Quote contains at least one strength and no deficiencies. Weaknesses, if any, are minor and are more than offset by strengths." AR 124. In the Court's estimation, there are two problems with BCD Travel being awarded a "Good" rating despite it proposing to use key personnel that lacked "U.S. Government travel experience." First, BCD Travel's quote was required to "meet[] requirements" of the RFQ to receive a rating of "Acceptable" or above on the technical approach evaluation. *Id*. Second, if a quote contained "at least one deficiency," the highest it could be rated was "Marginal." *Id*.

Whether evaluated as "not clearly meet[ing] requirements" or "[a] material failure of a quote to meet a Government requirement" and, therefore, a deficiency, by not including key personnel in its quote who met the RFQ's requirements, the highest rating BCD Travel could have received on its technical approach evaluation was "Marginal."[4] This was two ratings below the "Good" rating that BCD Travel actually received. Because the quotes were rated on a best value basis across four categories, this lower rating almost certainly would have precluded BCD Travel from being awarded the Army travel contract. The first category—TMC PNR

---

[4] "Quote does not clearly meet requirements, and has not demonstrated an adequate approach and understanding of the requirements. Quote contains at least one deficiency and weaknesses are not offset by strengths. The quote is considered to be a significant risk to the Government." AR 385.

Validation—was rated on a Pass/Fail basis.  The next two—Technical Approach and Past Performance—were rated on an adjectival basis.  And the final category was price.  While BCD Travel's price would still be lower than Plaintiff's, its rating on technical factors would drop at least two spots below Plaintiff's "Good" rating.  Additionally, Plaintiff was rated one spot above BCD Travel on Past Performance.

According to the RFQ, "Technical and Non-Technical Factors, when combined, are significantly more important than price.  However[,] as technical and non-price related factors become more equal, price becomes more important and may become the determining factor for award."  AR 123.  Moreover, the RFQ provided that "[t]he Government is more concerned with obtaining superior technical features than with making award at the lowest price to the Government.  However, the Government will not make an award at a significantly higher overall price to the Government to achieve slightly superior technical features."  *Id*.

Reviewing the revised award determination, it is clear to the Court that equivalent or nearly equivalent ratings in non-price factors turned the Contracting Officer's decision towards price as the ultimate determining factor.  *See* AR 2560 ("In reviewing the evaluation of the quotes submitted by BCD Travel and [Plaintiff], the only differences in evaluations between the two companies are [Plaintiff's] higher rating in past performance and BCD's lower price in performance of this effort.").  Thus, but for GSA's errors in its non-price factor evaluations, it is likely the Contracting Officer's decision would have been less swayed by a price differential and more focused on the RFQ's concern "with obtaining superior technical features . . . ."  AR 123.  In that universe, Plaintiff would be substantially more likely to receive the award.  Accordingly, Plaintiff was prejudiced by GSA's errors.

## 2.  Price Evaluation

Plaintiff takes substantial issue with GSA's evaluation (or alleged insufficiency thereof) of BCD Travel's pricing.  In particular, Plaintiff points to BCD Travel's overall price, as well as its intention to support travel transactions via [***] at no cost to the government.  Plaintiff weaves these objections into somewhat overlapping allegations of unrealistic and unbalanced pricing.  The Court has carefully examined the allegations and the portions of the Administrative Record related to them and addresses unrealistic and unbalanced pricing in turn.

### a.  *GSA Failed to Conduct a Price Realism Analysis*

With regard to unrealistic pricing, this Court has "noted that an agency may use a price realism analysis 'to measure an offeror's understanding of the solicitation requirements, or to avoid the risk of poor performance from a contractor who is forced to provide goods or services at little or no profit.'"  *KWR Constr., Inc. v. United States*, 124 Fed. Cl. 345, 356 (2015) (quoting *Am. Safety Council, Inc v. United States,* 122 Fed. Cl. 426, 438 (2015)).  "Generally, a price realism analysis 'examines the performance risk of proposals in a fixed-price contract procurement, with particular attention to the risk of low-priced proposals . . . .'"  *Id*. (quoting *DMS All–Star Joint Venture v. United States,* 90 Fed. Cl. 653, 663 (2010)).  Plaintiff alleges, and for the reasons discussed below the Court concurs, that GSA failed to perform an overall price realism analysis as required by the RFQ.

14

       i.    *The terms of the RFQ and Plaintiff's allegations*

In addressing Plaintiff's price realism allegations, the Court begins with the pertinent clause of the RFQ, which provides:

> The Government will take into consideration any unbalanced pricing. An overall price that is excessively high or low (without sufficient justification) may be considered unrealistic and unreasonable and may receive no further consideration.

AR 128. Plaintiff argues that GSA "failed to perform any rational price realism analysis" and that its failure to do so "was arbitrary, capricious, and contrary to the RFQ's evaluation criteria." Pl.'s Mot. for TRO/PI at 14. According to Plaintiff, "BCD's pricing is unrealistically low when compared to the incumbent CWT, the IGCE and, upon information and belief, the other incumbent, Omega World Services ('Omega')." *Id.* Because GSA allegedly "failed to evaluate whether BCD understood the RFQ requirements to service [***] transactions or the potential adverse impact on BCD performance," Plaintiff asserts that GSA's price evaluation was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and that Plaintiff was prejudiced by GSA's actions. *Id.* at 15-16.

In response, the government unequivocally states that "GSA conducted a price realism analysis by following the terms in the RFQ, which focused solely on *overall price*." Gov.'s Resp. at 23-24. In support of its statement, the government cites a clause in the revised award determination in which the Contracting Officer avers that "all pricing [proposed], as indicated below, was considered complete, reasonable, and realistic." *Id.* (quoting AR 2559). Accordingly, the government contends that Plaintiff "is unlikely to succeed to [sic] in any challenge to the agency's price realism analysis." *Id.* at 24.

In its reply, Plaintiff reiterates that BCD Travel's "proposal to perform [***] of the work under the Task Order for free (i.e., by offering a $0.00 fee [***]) certainly undermines the realism of its overall price, [but] is not the only fact that shows BCD's overall price is unrealistic." Pl.'s Reply at 13. According to Plaintiff, it is also "unrealistic to conclude that BCD could compensate [***] FTEs who are highly-qualified and fully-trained to serve as travel consultants and also perform all of the remaining Task Order requirements at an average annual price of about $[***] million." *Id.* Plaintiff argues that these aspects of BCD Travel's quote "should have led the Agency to conclude BCD either misunderstood the material requirements of the RFQ, posed a risk of poor performance, or both," because BCD Travel's "average annual price for POS transactions, as evaluated, . . . would leave little to nothing to cover the rest of BCD's costs for key personnel, CBA reconciliation processing, equipment, overhead, and profit or payments to small business subcontractors." *Id.* at 15-16.

   ii.  *The RFQ requires GSA to conduct a price realism analysis*

   Although the FAR itself does not mandate that an agency conduct a price realism analysis, "this Court has held that when the RFP provides that unrealistically low offers *may* be considered unacceptable and rejected on that basis, a price realism analysis has been contemplated *and must be conducted*." *ViON Corp. v. United States*, 122 Fed. Cl. 559, 573 (2015) (internal quotations omitted) (emphasis added).  In *ViON Corp.*, the RFQ "expressly provide[d] that '[t]he Government *may* reject any proposal that is . . . unreasonably high or low in price when compared to Government estimates, such that the proposal is deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program.'"  *Id*.  Such language "commits the agency to conducting a price realism analysis."  *Id*.; *see also Rotech Healthcare, Inc. v. United States*, 121 Fed. Cl. 387, 404 (2015) ("[T]he only reason any consideration of realism is necessary is the language in the RFP stating that unrealistically low offers *may* be eliminated.") (emphasis added); *FCN, Inc. v. United States,* 115 Fed. Cl. 335, 376 (2014) ("Because a price realism analysis was contemplated by the Solicitation, one had to be conducted, as the Solicitation stated that unrealistically low offers 'may be considered unacceptable and rejected on that basis.'").  In short, as indicated by previous cases before this Court, when an agency provides notice in a solicitation that it is going to conduct a price realism analysis, it *must* conduct a price realism analysis—even if the FAR does not require it.

   In its initial Agency Report to GAO following Plaintiff's first protest, GSA unequivocally stated that it "was *not* required to conduct a price realism analysis," AR 2384, "BCD's lower price *did not merit* an exercise of that discretion," AR 2385, and "**GSA reasonably exercised its discretion in *not conducting a price realism analysis***," AR 2399 (emphases added).  Moreover, it claimed,

> GSA did reserve the right to conduct a price realism analysis if an offeror's price was excessively low without justification.  However, GSA also retained its discretion to reasonably determine that a price realism analysis was not required.  *CWT is simply incorrect that GSA was required to conduct a price realism analysis by the solicitation language*.

AR 2398 (emphasis added).  However, the case law in this Court—as well as, it seems, at GAO[5]—demonstrates that in fact GSA is "simply incorrect."

   Here, the RFQ provides that "[a]n overall price that is excessively high or low (without sufficient justification) may be considered unrealistic and unreasonable and may receive no

---

[5] *See, e.g.*, *Esegur-Empresa de Segurança, SA*, B-407947, B-407947.2 at 4 (Comp. Gen. Apr. 26, 2013) ("To the extent the Air Force believes that the evaluation of prices for realism was optional because the solicitation indicates that unrealistically low price proposals 'may' be found unacceptable . . . the Air Force's belief is based on an unreasonable reading of the solicitation."); *Logistics 2020, Inc.*, B-408543, B-408543.3 at 8 (Comp. Gen. Nov. 6, 2013) (holding that agency "committed itself to a review of price realism" because "the RFP . . . informed offerors that the agency 'may reject any proposal that is evaluated to be . . . unrealistically high or low cost when compared to the Government estimates . . . .'").

further consideration." AR 128.  Just as in, *inter alia*, *ViON Corp.*, *FCN Inc.*, and *Rotech Healthcare, Inc.*, the language in the instant solicitation commits GSA to conduct a price realism analysis.  At best, GSA's choice of wording grants it discretion as to how and what to do with its price realism analysis—not the discretion of whether to conduct one in the first place.

Because the RFQ clearly mandates a price realism analysis, in some respects it is fortunate for GSA that the government now, in this forum, asserts without hesitation that "GSA conducted a price realism analysis by following the terms in the RFQ, which focused solely on *overall price*."  Gov.'s Resp. at 23-24.  Leaving aside the entirely conflicting factual representations by government attorneys in two forums (one of whom was an attorney in *both* forums) against the *same* Plaintiff, regarding the *same* solicitation, and the *same* grounds for protest, the Court proceeds to weigh the accuracy of the position the government now takes in this Court.[6]

> iii.   *The Administrative Record does not indicate that GSA conducted a price realism analysis as required by the terms of the RFQ*

Because the RFQ clearly requires a price realism analysis, the question becomes: what did GSA need to do to satisfy that requirement?  And, more importantly, did GSA do so—notwithstanding its agency counsel's contrary representations to GAO?

To answer these questions, "the court looks at whether the agency's price realism analysis was consistent with the requirements of the RFP."  *KWR Constr., Inc.*, 124 Fed. Cl. at 357.  "The FAR does not mandate any particular method of proceeding, and 'the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion.'"  *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 357 (2009) (quoting *Pemco Aeroplex, Inc.*, B–310372.3, 2008 CPD ¶ 126, 2008 WL 2684841, at *5 (Comp. Gen. June 13, 2008)).  Likewise, the Federal Circuit has compelled this Court to determine "whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the RFP . . . not to introduce new requirements outside the scope of the RFP."  *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009) (citation omitted).  Moreover, "[t]he agency's discretion is even more pronounced when the Solicitation is silent regarding the methodology to be used in conducting a 'price realism analysis' . . . ."  *Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 358 (quotation omitted).

While "analyzing whether an offeror's fixed price is so low that it reflects a lack of understanding of solicitation requirements is the crux of a price realism evaluation," *Flight Safety Servs. Corp.*, B–403831, 2010 CPD ¶ 294, 2010 WL 5241433, at *4 (Comp. Gen. Dec. 9,

---

[6] The Court notes that, at the very least, these diametrically opposed statements of fact made by the government before GAO and this Court, as to whether a price realism analysis was conducted, should have been directly addressed in this Court when the government chose to change its position regarding this material fact.  *See* RCFC 11(b).

2010), summary conclusions regarding price realism have been held to be insufficient, as have instances in which an agency did not meaningfully conduct the price realism analysis to which it had committed.  *See, e.g.*, *Afghan Am. Army Servs. Corp.,* 90 Fed. Cl. at 358 (finding price realism analysis insufficient even though the agency "compared the prices received with each other and with an IGE based on acquisition of previous similar items, and reviewed the proposals for compliance with the terms of the solicitation.").  As this Court explained in *Mortgage Contracting Services, LLC v. United States*,

> [t]he agency's simple statement that the [awardee's] prices are in line with the CPR alone does not merit a finding that the price realism analysis is sufficient. Although the evaluations included various charts, the charts are not given any context by the agency. . . .  Regarding price, the agency has failed to explain why it found [the awardee's] price was realistic, why it chose the various metrics to evaluate price realism, and which metric the agency applied to determine price realism.  Despite the documentation provided by the agency quoted above, there remains insufficient explanation of why the agency found [the awardee's] price realistic for the requirements of the Solicitation.

153 Fed. Cl. 89, 138, 140 (2021).

In the instant case, GSA arguably had it easy.  The RFQ states that "[a]n *overall* price that is excessively high or low (without sufficient justification) may be considered unrealistic and unreasonable and may receive no further consideration."  AR 128 (emphasis added).  The RFQ, "therefore, required a price realism analysis, but did not specify how the agency was to evaluate price realism, or mandate any specific approach."  *Mortgage Contracting Servs.*, 153 Fed. Cl. at 136.  Thus, in some respects, all the record must demonstrate is that GSA conducted an overall price realism analysis.

### PET Report, Pre-Negotiation Memorandum, Clarifications, and Initial Award Decision

Searching for any evidence in the Administrative Record of a price realism analysis, the Court first reviews GSA's Price Evaluation Consensus Report ("PET Report"), dated August 10, 2020.  AR 1664-67.  In relevant part, the PET Report states with regard to BCD Travel's quote:

- Reasonableness/Realism
  - Although reasonable, Unit Prices for all CLINs related to [***] such as [***] are noted as FTE hourly rates and *may not be realistic* if BCD Travel omitted any other potential relocation costs
  - Unit Price for CLIN 015 (Site Requested Staffed Office(s)) already seems unreasonable since it's more than [***] compared to the IGCE and because BCD Travel noted it as a lone FTE hourly rate, it *may not be realistic* since they didn't note any potential equipment costs as listed in the RFQ

- o   The offeror did not include a cost for [***] which based on historical data is [***] transactions.  It doesn't seem reasonable to support over [***] of the business requirements for free
- Risks
  - o   Unit Prices for all CLINs related to [***] such as [***] are noted as a lone FTE hourly rate and may pose a risk if BCD Travel omitted any potential costs for setup, equipment, travel, etc. as listed in the RFQ
  - o   Based on the vendor's low pricing strategy, the government will be accepting a significant risk regarding whether this company really understands the requirements to manage government travel

AR 1665 (emphasis added).

Giving GSA the benefit of the doubt, the most that can be said here is that the PET flagged for the Contracting Officer a *potential* price realism issue with regard to certain *individual contract line items* in BCD Travel's quote (i.e., the [***] and [***]).[7]  *Id.*  The Court finds no analysis here, nor any evidence that one was "meaningfully conduct[ed]" behind the scenes.  *Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 359.  Even had the PET Report concluded that the referenced CLINs *are* realistic (or *are un*-realistic), such a "simple statement" would find little shelter in this Court.  *Mortg. Contracting Servs., LLC*, 153 Fed. Cl. at 138.  The more pressing problem for GSA, however, is that the terms of its RFQ command a price realism analysis that, as the government now insists, "focus[] solely on *overall price*."  Gov.'s Resp. at 31.  Thus, the Court's search of the Administrative Record for evidence of such an analysis continues.

The Court next examines GSA's "Pre-Negotiation Memorandum."  AR Tab 20.  The "Pricing Analysis" portion of the memorandum states that analysis was "conducted to determine if pricing is fair and reasonable"—but what about realistic?  AR 1744.  The memorandum eventually restates the RFQ's price evaluation criteria and concludes:

> After reviewing the quotes submitted by all three offerors, the appearance of unbalanced pricing was discovered in two of the offeror's quotes.  BCD Travel provided a 100% discount (i.e. $0.00 proposed unit price) for [***] which is based on historical data of [***] transactions.  It does not appear to be reasonable that BCD Travel would be able to support over [***] of the Government's requirements for free.  As for BCD Travel's proposed prices for the [***], *although the proposed pricing is considered reasonable, there is a question of whether the FTE hourly rates proposed are realistic* if BCD Travel omitted any other [***].  Additionally, BCD Travel's proposed pricing for the [***] appears unreasonable since it is more than [***] higher than the IGCE *and may not be realistic* since BCD Travel identified the FTE hourly rate but made no reference to any potential equipment costs.  Based on the vendor's low pricing strategy, the government may be accepting a significant risk regarding whether the company

---

[7] Notably, the PET Report concludes with "[w]e recommend awarding to CWTSatoTravel since there were no deficiencies or risks identified" in its price evaluation.  AR 1666.

really understands the requirements to manage government travel.  *The CO will seek clarifications to BCD's price quote in order to determine whether the prices are in fact unreasonable and unrealistic.*

AR 1748-49 (emphasis added).

The Court particularly notes the memorandum's clear recognition of a difference between reasonable and realistic.  While BCD's [***] CLINs were found "reasonable," there remained— as of the date of the Pre-Negotiation Memorandum—"a question of whether the [***] proposed are realistic" and a warning that BCD Travel's [***] CLIN "may not be realistic" either.  AR 1748-49.  As for BCD Travel's [***] pricing, there is no reference to realism but, rather, a caution that it "does not appear to be reasonable . . . ."  AR 1748.  Given these unknowns, the Contracting Officer elected to address the following via "clarifications" from BCD Travel:

2.  Request the contractor confirm its intent to process [***] transactions at no cost to the Government.  The CO will also confirm that the contractor understands that under the firm-fixed priced contract type, the contractor will not be subject to any adjustment on the basis of the contractor's cost experience in performing the contract.  This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss.

3.  BCD stated in its quote that the proposed price of [***] for [***] was [***].  However, this is contrary to the Government's requirement and specifically its definition for how [***] transactions are to be charged.  Per Section 1.4.2 Definitions, under the definition for Transaction Fee, [***] transactions are defined as "one fee is charged per charter arrangement, which may include multiple busses for multiple travelers."  CO to request that BCD confirm its proposed price of [***] is per charter arrangement, not per traveler.

4.  CO to request that BCD confirm its proposed price for all [***] CLINs include not only the proposed FTE hourly rate but also any other potential [***] costs that may be needed to perform the relocation.

5.  CO to request that BCD confirm its proposed price(s) for the [***] includes any potential equipment costs.

6.  CO to request that BCD confirm its proposed price(s) for all [***] CLINs include any potential costs for setup, equipment, travel, etc.

AR 1749-50.  Just like the PET Report that preceded it, the Pre-Negotiation Memorandum—at best—flags *individual* CLIN prices in BCD Travel's offer as *potentially* unrealistic, while noting BCD Travel's "low pricing strategy" as *potentially* "a significant risk regarding whether the company really understands the requirements to manage government travel."  AR 1749.  Accordingly, the Court's search continues for any evidence of an overall price realism analysis as required by the RFQ.

On September 3, 2020, GSA emailed BCD Travel "to conduct written discussions . . . on [its] price quotation" and requested BCD Travel's response to the questions raised in the Pre-Negotiation Memorandum.  AR 1831.  BCD Travel replied on September 8, 2020, providing its response to GSA's clarification questions.  AR 1831-32.  In part, BCD Travel confirmed that,

> we are not charging a transaction fee for [***] transactions.  We understand that this is a firm-fixed priced contract and not subject to any adjustment on the basis of BCD's cost experience in performing the contract.  We know that we assume all risk and full responsibility for all costs and the resulting profit or loss.

AR 1836.  BCD Travel's response then goes on to provide four justifications for its [***] pricing model and "confirms" its proposed price for all [***], [***] CLIN, and all [***] CLINs.  AR 1836.

While the government's brief in this Court failed to address Plaintiff's overall price realism allegations,[8] GSA did attempt to address these allegations before GAO, relying heavily on the "discussions" GSA had with BCD Travel as evidence of a fulsome price realism analysis.  At GAO, GSA represented that "[a]lthough a price realism analysis was **not** required of BCD's offer, GSA's follow-up discussions with BCD *confirmed that their low prices were justified* consistent with the Army RFQ and relevant procurement law."  AR 2398 (emphasis added).  In Plaintiff's second bid protest at GAO, GSA argued that "[t]he PET did take note of BCD's low prices.  However, *GSA sought, and received, sufficient justifications* for BCD's low-price strategy.  This satisfied the requirements of the Army RFQ, as set out in its plain language."  AR 3094 (emphasis added).  Similarly, "GSA sought, *and received*, a *thorough response* from BCD justifying its $0 [***] fees . . . ."  AR 3097 (emphasis added).

However, the Court observes—as BCD Travel itself helpfully points out by reference— that **BCD Travel's four "justifications" are pulled *verbatim* from its own quote**, all under the heading "[***] Travel Arrangements."  *Compare* AR 615 *with* AR 1836 and 1863.  In other words, at least with respect to [***], the Contracting Officer had BCD Travel's justifications in hand and clearly identified *well before* the decision was made in the Pre-Negotiation Memorandum to "seek clarifications to BCD's price quote in order to determine whether the prices are in fact unreasonable and unrealistic."  AR 1749.  The Court respectfully declines to weigh-in at this time on whether mere discussions with an offeror can ever suffice for a mandated price realism analysis.  But it would seem the very definition of arbitrary and capricious for an agency to conclude that the reasoning an offeror has already provided to an agency and is clearly within an agency's possession *before* it sought clarifications can somehow

---

[8] Plaintiff raises legitimate questions about BCD Travel's overall price and its potential impact on BCD Travel's ability to hire and retain staff to carry out the contract.  "If BCD merely compensated the hundreds of promised travel consultants at Service Contract Act wages it would lose millions of dollars over the course of the contract, in addition to the losses resulting from providing [***] services for free."  Pl.'s Mot. for TRO/PI at 19. The government's response fails to address this specific allegation.  While a defendant need not respond to every line of argument, Plaintiff's allegations at the very least add credence to the argument that an overall price realism analysis—and determining whether the offeror's price reflects a lack of understanding of the solicitation requirements—was not conducted.  The government's silence on this point is noted.  Oral argument provided additional explanations for BCD Travel's ability to retain staff, but GSA was required by the RFQ to conduct such an analysis as part of its evaluation (not leave it to the Court to conduct the analysis during oral argument).

suffice for a "meaningful" price realism analysis when that same reasoning is repeated verbatim to the agency in a later communication.

Of course, this entire line of argument appears a distraction from the real problem with the government's argument. To refresh, as the government has repeatedly pointed out, the RFQ warns of the potential consequences of "[a]n *overall* price that is excessively high or low . . . ." AR 128 (emphasis added). While the record indeed reflects that GSA engaged in discussions with BCD Travel regarding specific CLIN prices, it is entirely devoid of anything claiming to be a realism analysis of BCD Travel's overall price. And neither the government here, nor GSA at GAO, has directed the Court's attention to anything in the Administrative Record that could be construed as one. The government cleverly tries with its statement that because "BCD's overall price was approximately 13 percent lower than CWT's overall price [this] *demonstrates* that BCD's price was not unrealistically low." Gov.'s Resp. at 31 (emphasis added). To which the Court asks, what is the government's point? It is not the Court's job to determine whether BCD Travel's overall price is (or is not) realistic. That task alone was for GSA to determine by conducting a price realism analysis. The single inquiry here is whether GSA followed through with what it committed to do in its own RFQ. Thus far, no such evidence appears in the record.

### GSA Re-Evaluation Memorandum and second GAO protest

Following Plaintiff's initial protest at GAO, GSA took corrective action and re-convened its TET—not, however, its PET—to re-evaluate BCD Travel's quote. AR 2552. The Contracting Officer's re-evaluation memorandum concludes that for "all three offerors," all pricing "was considered complete, reasonable, and *realistic*." AR 2559 (emphasis added). Of course, there is no indication in the record that an overall price realism analysis had suddenly occurred. At best, the addition of "realistic" in the re-evaluation memorandum strikes the Court as simply a post-hoc justification, as GSA was by then on full notice of Plaintiff's price realism allegations.

Even if, however, the Court were to grant some credence to GSA's statement, the memorandum makes clear that it is based on GSA's identification of "four separate CLIN's in its evaluation [of BCD Travel] . . . as potentially unrealistic" but "[t]hrough discussion with BCD, the Government requested and received sufficient justification for each . . . ." AR 2558. As the Court has already determined, these particular discussions were an insufficient replacement for a price realism analysis and, moreover, concerned individual CLINs—not BCD Travel's overall price.

What is more, another oddity arising out of GSA's price realism defense before GAO suggests to the Court that a bona fide price realism analysis could not have been conducted in the first place—even on an individual CLIN basis. In responding to Plaintiff's allegations regarding the Independent Government Cost Estimate ("IGCE") and an insufficient realism analysis, GSA's agency counsel describes Plaintiff's argument as circular "because the IGCE was based on the prices that [Plaintiff], the incumbent, is currently charging. As such the [***] fee in the IGCE is not evidence of what a realistic [***] fee is. It is evidence of what [Plaintiff's] prices have been over time." AR 3098 (citation omitted). If GSA admits that its own independent price estimate "is not evidence of what a realistic" price point is, how could GSA have

22

conducted a price realism analysis that is anything other than arbitrary and capricious? *See Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 358 ("The more serious objection to the realism analysis is that the [Independent Government Estimate] itself was fundamentally flawed.  An agency's price-realism analysis lacks a rational basis if the contracting agency made 'irrational assumptions or critical miscalculations.'") (quoting *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000)).[9]

In sum, the Court poured over the Administrative Record in search of anything appearing to be an *overall* price realism analysis.  The task proved futile.  Instead, the Court is left with a strange mess of the government's own making.  To the extent the agency conducted a price realism analysis, *which GSA itself asserted it did not*, that analysis resulted in a recommendation against BCD Travel because of its *potentially* unrealistic pricing and risk of unsatisfactory performance.  Truth be told, Plaintiff's allegation that GSA failed to perform a "rational" price realism analysis appears to give GSA too much credit.  No such analysis appears to have occurred.  Instead, if GSA did conduct an overall price realism analysis, "the agency's own evaluations do not reflect why the [agency] found [the awardee's] prices were realistic." *Mortg. Contracting Servs., LLC*, 153 Fed. Cl. at 138.  This mess is not for the Court to resolve, but for GSA to correct in accordance with the terms of its own RFQ.  For all these reasons, Plaintiff succeeds on its allegation that GSA failed to conduct an overall price realism analysis as required by the RFQ.

### b. *GSA Failed to Analyze BCD Travel's Quote for Unbalanced Pricing*

Plaintiff next asserts that GSA "did not analyze the unbalanced [***] and [***] because they were below cost and GSA was only concerned if there were an overcharge to the Government." Pl.'s Mot. for TRO/PI at 20.  While not a model of clarity, the Court interprets this as a general "process" objection to the sufficiency of GSA's unbalanced pricing analysis. Plaintiff also highlights BCD Travel's quote as evidence itself of unbalanced pricing, alleging that "[t]he fact that BCD was offering to provide [***] of the Army travel transactions for free also *indicates* unbalanced pricing under FAR 15.404-1(g)(2)." *Id.* (emphasis added). Furthermore, Plaintiff argues that:

> Even though BCD indicated in its proposal that it was increasing the price for agent assisted transactions since the [***] transactions were free, GSA dismissed this unbalanced pricing because BCD's Agent assisted transaction CLIN pricing was still lower than CWT and the IGCE.  The fact that BCD's pricing was unrealistically low and unbalanced indicates that BCD did not understand the RFQ requirements.

---

[9] For good measure, the Court also submits that the [***] discount off the government's own overall estimate might have counseled at least a cursory analysis and explanation by the agency for price realism.  To be sure, this Court has upheld an agency's evaluation of rather sizeable discounts in a bidder's pricing, and it is indeed possible that BCD Travel's nearly [***] discount is entirely realistic. *See, e.g., Cohen Fin. Servs., Inc. v. United States*, 110 Fed. Cl. 267, 288 (2013) ("Although MMC cites to *CTA* for the proposition that a bid more than forty percent below the Government's estimate can still be realistic, the *CTA* court reached that determination *only after quoting a detailed price realism analysis* in the Administrative Record, an analysis that is missing in this case.") (emphasis added).  Unlike such instances, however, there is no indication in the record here that GSA conducted an overall price realism analysis—much less a 'detailed' one—of a nearly [***] discount off the government's price estimate.

*Id.*

In response, the government asserts that Plaintiff's allegations lack merit because, at least with respect to the "process" allegation, "GSA *did* in fact review BCD's price quote for unbalanced pricing . . . ." Gov.'s Resp. at 32 (emphasis added). While Plaintiff points to the substance of the PET's concerns about certain BCD Travel CLINs, *see* Pl.'s Mot. for TRO/PI at 19, the government interprets this as Plaintiff thereby "conced[ing] that GSA conducted an unbalanced pricing analysis," Gov.'s Resp. at 32. As to Plaintiff's price-specific allegations, the government argues that "[b]ecause BCD's pricing for [***] transactions and agent assisted transactions were both less than CWT's price for comparable transactions, there is nothing unbalanced with BCD's pricing and there is certainly no risk that the Government will pay high prices to BCD given that CWT's prices are higher." Gov.'s Resp. at 33.

In assessing Plaintiff's unbalanced pricing allegations, the Court again starts with the language of the RFQ, which provides that "[t]he Government will take into consideration any unbalanced pricing." AR 128. This acknowledges the obvious: GSA is required by law to analyze bids in fixed-price contracts for unbalanced pricing. 48 C.F.R. § 15.404-1(g); *see also Green Tech. Grp., LLC v. United States*, 147 Fed. Cl. 231, 240 (2020) ("As part of a fair-and-reasonable-pricing determination, an agency must determine whether offerors' prices are balanced."). Per the pertinent part of the applicable section of the FAR,

> (2) All offers with separately priced line items or subline items *shall* be analyzed to determine if the prices are unbalanced. If cost or price analysis techniques indicate that an offer is unbalanced, the contracting officer *shall*—

>> (i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and

>> (ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.

> (3) An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.

48 C.F.R. § 15.404-1(g) (emphasis added). In short, if the review of a quote indicates unbalanced pricing, an agency must proceed to a two-part analysis to consider the risk of paying unreasonably high prices *and* the risk of unsuccessful performance. While there is no bright-line test to evaluate when an overstated or understated line-item price is of such significance that it poses risks of unsuccessful performance or unreasonably high prices, *Green Tech. Grp., LLC*, 147 Fed. Cl. at 240, "a significant disparity in only one CLIN price may justify the rejection of a proposal as unbalanced," *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 515 n.17 (2003).

Reviewing the record, the Court looks again to the PET Report.  For BCD Travel's quote, the PET observed that "[***] already seems unreasonable," and, with regard to [***] transactions, "[i]t doesn't seem reasonable to support over [***] percent of the business requirements for free . . . ."  AR 1665.  Moreover, the PET concluded that "[b]ased on [BCD Travel's] low pricing strategy, the government will be accepting a significant risk regarding whether this company really understands the requirements to manage government travel . . . ." *Id*.  While the terms "balanced" or "unbalanced" (or some variation thereof) do not appear in the PET Report per se, the PET implicitly flagged the appearance of unbalanced pricing in BCD Travel's quote, including the "significant risk" it posed to the government.  Removing any doubt, the Contracting Officer's Pre-Negotiation Memorandum goes the additional step and calls it by its name:

> After reviewing the quotes submitted by all three offerors, *the appearance of unbalanced pricing was discovered* in two of the offeror's quotes.  BCD Travel provided a 100% discount (i.e. $0.00 proposed unit price) for [***] transactions which is based on historical data of [***] transactions.  It does not appear to be reasonable that BCD Travel would be able to support over [***] of the Government's requirements for free. . . . Additionally, BCD Travel's proposed pricing for the [***] CLIN appears unreasonable since it is more than [***] higher than the IGCE and may not be realistic since BCD Travel identified the FTE hourly rate but made no reference to any potential equipment costs.  Based on the vendor's low pricing strategy, the government may be accepting a significant risk regarding whether the company really understands the requirements to manage government travel.  *The CO will seek clarifications to BCD's price quote in order to determine whether the prices are in fact unreasonable and unrealistic.*

AR 1748 (emphasis added).

In light of both the PET Report and Pre-Negotiation Memorandum, it is reasonable to conclude that "price analysis techniques indicate[d] that an offer is unbalanced . . . ."  48 C.F.R. § 15.404-1(g); *see also Green Tech. Grp., LLC*, 147 Fed. Cl. at 240-41 ("In the course of its pricing evaluation, the Agency implicitly determined that LinTech's pricing was materially unbalanced").  Accordingly, the FAR mandates that GSA proceed to the two-part unbalanced pricing analysis, whereby it must consider *both* the risk of paying unreasonably high prices *and* the risk of unsuccessful performance.

Reviewing the record for evidence of the mandated two-part analysis, the Court first gives credit where it is due.  GSA indeed scrutinized at least some *individual* CLINs to the point of identifying a potentially "significant risk regarding whether [BCD Travel] really understands the requirements to manage government travel."  AR 1665.  This is more than can be said about overall price, which as the Court concluded above, was not the subject of a price realism analysis—much less a meaningful one.  Credit to GSA rapidly fades, however.  Between the Pre-Negotiation Memorandum, which flagged "the appearance of unbalanced pricing," AR 1748, and the Price Negotiation Memorandum of September 17, 2020, "recommend[ing] that a task order

be awarded to BCD Travel," AR 1943, there is no mention or documentation whatsoever of the required unbalanced pricing analysis.

With respect to the price risk prong, the government's brief asserts that "there is no risk with respect to unbalanced pricing here based on the risk of the Government paying high prices for price assisted transactions because BCD's pricing for both [***] transactions and agent assisted transactions are less expensive than CWT's prices." Gov.'s Resp. at 33. That may indeed be so. However, the government's brief made no attempt to point the Court to anything in the 4,000 plus page record demonstrating that this was *GSA's* pre-award analysis and justification.

With respect to the performance risk prong, the government's brief asserts that "GSA considered possible unbalanced pricing, raised the issue with BCD during discussions, reviewed BCD's response and determined that, based upon all the information provided, there was no risk to the Government of alleged unbalanced pricing." *Id*. at 33-34. To the extent GSA's discussions with BCD may be perceived as a pre-award analysis, the Court declines—for the same reasons articulated for price realism—to give it any credence.[10] The government next asserts that "given the contracting officer's broad discretion and that *CWT has not demonstrated 'unacceptable risk'* to the Government, CWT is unlikely to succeed on its claim that BCD's pricing is unbalanced." *Id*. at 34 (emphasis added). Here, the government articulates a curious line of argument, as the FAR requires the *contracting officer* to "[c]onsider the risks to the Government associated with the unbalanced pricing . . . ." 48 C.F.R. § 15.404-1(g)(2)(i). The burden is not on Plaintiff to "demonstrate unacceptable risk," and the government cannot cleverly pass Plaintiff the burden just because the Administrative Record is bereft of any apparent evidence to overcome the burden on its own.

In sum, the closest thing the Court can find in the Administrative Record to an unbalanced pricing analysis comes from post-award justifications to GAO and this Court. But GSA's "*post hoc* arguments are unavailing and not an acceptable substitute for the pre-award analysis required by the FAR." *Green Tech. Grp., LLC*, 147 Fed. Cl. at 242. No pre-award unbalanced pricing analysis is apparent here, let alone one consistent with the FAR. Accordingly, Plaintiff also succeeds on its allegation that GSA failed to conduct an unbalanced pricing analysis.

### c. *Plaintiff was prejudiced by GSA's failure to conduct adequate price analyses*

As discussed above with regard to Plaintiff's key personnel argument, Plaintiff must not only demonstrate that GSA misapplied the RFQ's price analysis requirements, it must also show that these misapplied requirements prejudiced it. *See, e.g.*, *Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 366 ("Despite the existence of errors in a procurement, the plaintiff is not entitled to relief unless it can show prejudice . . . ."). Plaintiff argues that GSA "committed prejudicial error when it failed to perform a proper price realism analysis of BCD's quote, as [Plaintiff] was next

---

[10] Again, it would seem the very definition of arbitrary and capricious for an agency to conclude that the reasoning an offeror has already provided to an agency and is clearly within an agency's possession *before* it sought clarifications can somehow suffice for an unbalanced pricing analysis when that same reasoning is repeated verbatim to the agency in a later communication.

in line for the award." Pl.'s Reply at 20. As to unbalanced pricing, Plaintiff asserts "a protester need not show prejudice if the agency simply failed to do an unbalancing analysis," Pl.'s Mot. for TRO/PI at 20, and that GSA "committed prejudicial error when it failed to perform an unbalanced pricing analysis of BCD's quote, as [Plaintiff] was next in line for the award as the second lowest-priced offeror," Pl.'s Reply at 22. The Court finds Plaintiff's arguments convincing.

First, this Court has repeatedly held that an agency's failure to conduct a required price analysis is prejudicial in and of itself, constituting a "significant . . . error in the procurement process." *Al Ghanim*, 56 Fed. Cl. at 516 (citing *Alfa Laval Separation, Inc.*, 175 F.3d at 1367); *Active Network, LLC v. United States*, 130 Fed. Cl. 421, 429 (2017) ("Without a price realism analysis in the record, the Court has nothing to review and no way of determining whether Active was prejudiced. This conclusion alone is sufficient to warrant remand to conduct a proper price realism analysis."); *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 409 (2021) ("Therefore, this Court agrees with the *Al Ghanim* and *Green Tech.* line of cases and concludes that Plaintiff has adequately shown prejudice from the Navy's failure to perform an unbalanced pricing analysis.").

Second, the Federal Circuit has held that if an agency were obligated to rebid a contract following protest, and the successful protestor "could compete for the contract once again," then the protestor has satisfied the "substantial chance" standard. *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1334 (citing *Alfa Laval Separation, Inc.*, 175 F.3d at 1367). Clearly, Plaintiff could re-compete for the contract. Plaintiff had a higher past performance rating than BCD Travel, an equal technical approach evaluation rating (which would actually have been higher than BCD Travel's had the technical approach been evaluated properly regarding key personnel, as the Court explained above), and price was the determining factor according to GSA. Although the Court does not know what the outcome of proper price analyses would be, certainly there is a chance that the price differential that resulted in BCD Travel being awarded the contract over Plaintiff could change if proper price analyses are conducted. Therefore, it is a reasonable assumption that Plaintiff, one of the incumbent contractors, could quite capably re-compete for the contract following this protest.

Moreover, the government's argument against finding that Plaintiff was prejudiced is one that has regularly been rejected by this Court. The government alleges that Plaintiff cannot show prejudice "because [Plaintiff's] overall price and its prices for both [***] transactions and agent assisted transactions *are greater than BCD's pricing*." Gov.'s Resp. at 34 (emphasis added). But this argument glosses over the fact that properly conducted price realism and/or unbalanced pricing analyses might have either increased BCD Travel's quoted prices or simply resulted in its quote receiving no further consideration by GSA. *See, e.g., Al Ghanim*, 56 Fed. Cl. at 515 ("The general rule is that, even if an offeror's total price is lower than those proposed by other offerors, a protest still may be sustained if the low price indicates the offeror's lack of understanding of the solicitation's requirements or constitutes an excessive risk.") (quotation omitted); *Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 366 ("But once again, a proper price realism analysis, best-value tradeoff, and past experience evaluation could have changed that result."). Regardless of whether properly conducted price analyses would have resulted in increases in BCD Travel's quoted prices or its quote being removed from consideration, there was a substantial chance that

Plaintiff would have received the Army travel contract but for GSA's failures to follow the price evaluation requirements.

In sum, whether the Court looks for evidence of prejudice, or simply finds prejudice per se due to GSA's failure to properly conduct its price evaluation, Plaintiff easily succeeds in proving prejudice.

### 3. *GSA's Past Performance Evaluation was Rational*

Plaintiff has not met its burden with regard to its argument that GSA over-rated BCD Travel's past performance by rating BCD Travel "Good" instead of assigning it the lower "Acceptable" or "Neutral" ratings. It is well-established that this Court must afford an agency substantial deference in evaluating an offeror's past performance. *See, e.g.*, *Am. Auto Logistics, LP v. United States*, 117 Fed. Cl. 137, 186 (2014), *aff'd*, 599 F. App'x 958 (Fed. Cir. 2015) ("A protestor must overcome a 'triple whammy of deference by demonstrating by a preponderance of the evidence that the SSA lacked *any* rational basis' to assign a given past performance rating."); *Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 138 (2020) ("The agency's subject-matter experts are best suited to determine whether and to what extent the experience reflected in a past performance example instills confidence that the offeror will successfully perform and meet the needs of the agency on the contract at issue."); *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 396 (2011) (quoting *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 505 (2005)) ("When the Court considers a bid protest challenge to a past performance evaluation conducted in the course of a negotiated procurement, 'the greatest deference possible is given to the agency.'"). Plaintiff has not shown that the substantial deference GSA is entitled to was abused with regard to past performance.

Under the RFQ, GSA examined BCD Travel's past performance of commercial travel management services for three companies: Federal Express, Raytheon, and Apple. During the re-evaluation of the solicitation, and after re-considering BCD Travel's past performance with those companies, GSA downgraded BCD Travel's past performance to "Good." In other words, GSA determined that BCD Travel's past performance was best characterized as "effort [that] involved similar scope and magnitude of effort and complexities this solicitation requires. Performance was very good in the majority of categories reviewed." AR 127.

Plaintiff claims that GSA's decision to rate BCD Travel's past performance as "Good" is irrational, arguing that BCD Travel should have received no higher than an "Acceptable" rating. Pl.'s Reply at 24-26. According to Plaintiff, BCD Travel's past work for Federal Express, Raytheon, and Apple demonstrates that BCD Travel only meets at best "some" of the "scope and magnitude of effort" and "complexities" required by the RFQ—rather than the "similar" scope and magnitude of effort required to receive a "Good" rating. *Id.* at 25. Thus, Plaintiff is essentially asking the Court to supplant GSA's review of BCD Travel's past performance with Plaintiff's own assessment. But this Court cannot substitute its own judgment of whether BCD Travel's past performance was similar in scope and magnitude for GSA's on this question. *See Todd Const., L.P. v. United States*, 88 Fed. Cl. 235, 247 (2009) ("In the bid protest context, the assignment of a past performance rating is reviewed only to ensure that it was reasonable and

consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.") (internal quotations omitted).

Unlike GSA's key personnel and price evaluations discussed above, it is clear that GSA did evaluate BCD Travel's past performance in terms of scope, magnitude, and complexity as required by the terms of the RFQ.  In fact, among other things, GSA determined that BCD Travel's:

> past performance history is impressive and demonstrates successful past performance history that is both relevant and recent.  The Offerors past performance included comprehensive details regarding its performing travel services similar in scope, magnitude, and complexities and clearly demonstrated the Offeror's history of professional behavior and overall business-like concern for the interests of the customer, including timely completion of requirements and customer satisfaction. . . . Additionally, the Offeror provided a comprehensive matrix for Raytheon and Fedex containing narratives, which described how the services provided by the Offeror align with the requirements in scope and complexity of the Army PWS and PRS to include size/scope; 24/7/365 services on-site, and via call centers and virtual agents; trip authorizations; [***] transition and adoption; compliance of government travel regulations; expense systems; usage of preferred supplier programs; adherence to per diems . . . .

AR 2544-46.  According to GSA's evaluation, the contract values of the three contracts included in BCD Travel's past performance also favorably compared to the value of the Army travel contract.  AR 2547, 2556-57.

Accordingly, the Court finds that GSA's past performance evaluation was rational, and Plaintiff is not entitled to judgment on the administrative record on this argument.

### 4.  *GSA Did Not Treat Plaintiff Disparately*

Similarly, Plaintiff has failed to show that GSA treated offerors disparately.  Under the FAR, "[a]ll contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same."  48 C.F.R. § 1.102-2(c)(3).  Moreover, a "contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria.  *Banknote Corp. of Am. v. United States,* 56 Fed. Cl. 377, 383 (2003), *aff'd,* 365 F.3d 1345 (Fed. Cir. 2004).  In order to prevail on a disparate treatment claim, the Federal Circuit requires that "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals."  *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).  In addition, the protestor must demonstrate that the specific unevenness prejudiced it from being awarded the contract.  *Id*. at 1373–74 ("To establish prejudicial error, a protestor must show that but for that error, the protestor had a substantial chance of receiving a contract award.").

The first issue with Plaintiff's disparate treatment claim is that it relates to two different evaluation factors: technical approach and past performance.  Plaintiff essentially argues that because GSA corrected an issue for BCD Travel on its past performance evaluation, GSA was then obligated to reach out directly to Plaintiff to correct completely different issues with Plaintiff's technical approach evaluation and, that by failing to do so, GSA treated Plaintiff disparately.  There are several problems with this argument.

To begin with, Plaintiff is taking issue with how GSA treated two entirely different evaluation factors.  To succeed on a disparate treatment claim, Plaintiff must at least demonstrate that GSA unevenly treated it by giving it a lower rating for having the similar deficiency on the same rating factor as BCD Travel.  *See Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 330 (2020), *appeal dismissed*, No. 2020-1615, 2020 WL 8995478 (Fed. Cir. Apr. 24, 2020) ("[T]he offerors' 'systemic issues' were of two inherently different breeds."); *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 516 (2007) (holding that the plaintiff had not proved disparate treatment because it could not show that "the record reflects that the Air Force unreasonably downgraded [the plaintiff's] technical proposal for deficiencies that are substantively indistinguishable from those found in the proposals of the other offerors who remained in the competitive range."); *cf. Constellation W., Inc. v. United States*, 125 Fed. Cl. 505, 553 (2015) ("An agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.").  Plaintiff has not made such a showing, and, in fact, GSA even rated Plaintiff higher on past performance than BCD Travel.  AR Tab 37.

Furthermore, Plaintiff's argument is based on the fact that GSA contacted one of BCD Travel's past performance references to fill in information because a non-disclosure agreement precluded BCD Travel from including certain information in its quote.  AR 2550.  The RFQ expressly permitted GSA to contact offerors' references regarding past performance.  AR 127, 381.  Rather than being improper, GSA's outreach to one of BCD Travel's references to obtain missing past performance information was expressly permitted by the terms of the RFQ.  AR 381 ("The Government reserves the right to include its own past experience with the Offeror, in addition to provided references, as well as other sources of past performance information available to the Government.").

The second shortcoming with Plaintiff's disparate treatment allegation is that even if there was disparate treatment, which amounted to a "correction" of BCD Travel's past performance evaluation, the "correction" apparently did not result in BCD Travel's past performance rating increasing.  It appears from the Administrative Record that BCD Travel would have received a "Good" rating with or without GSA reaching out to a reference regarding BCD Travel's past performance.  This is because another bidder also received a "Good" past performance rating, yet it too was missing past performance evaluation material from two past performance references.  AR 2557.  If that bidder could receive a "Good" rating with no material whatsoever from two references, then certainly BCD Travel would have at least received a "Good" rating with partial material missing from one reference.

In sum, Plaintiff fails to show that GSA's contact with one of BCD Travel's references amounted to disparate treatment, and, even if it did, Plaintiff has not demonstrated that it was prejudiced as a result.

30

## D.  Injunctive Relief

As the Court has determined that GSA's award of the Army travel contract to BCD Travel was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and that Plaintiff was prejudiced by GSA's actions, the Court now turns to the question of whether Plaintiff is entitled to injunctive relief.  The Federal Circuit has articulated the test for a permanent injunction as follows:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

*Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)).  Because Plaintiff has succeeded on the merits of its protest, the Court turns to the remaining injunctive relief factors.

### 1.  Irreparable Harm

With respect to irreparable harm, the pertinent question is "whether plaintiff has an adequate remedy in the absence of an injunction."  *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993); *see also Younger v. Harris*, 401 U.S. 37, 43-44 (1971) (noting that "the basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief").  Plaintiff asserts that it will be harmed absent the issuance of an injunction because the only other available relief—recoupment of bid preparation costs—would not remedy its loss of profits, key employees, benefits of incumbency, and the opportunity to participate in a fair procurement process for the Army travel contract.  Pl.'s Reply at 26-28.

"This court has recognized that a lost opportunity to compete for a contract—and the attendant inability to obtain the profits expected from the contract—can constitute irreparable injury."  *Bluewater Management Group, LLC v. United States*, 150 Fed. Cl. 588, 619 (2020) (citing *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 319 (2009); *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005)); *see also CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013) ("The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract."); *Serco Inc. v. United States*, 81 Fed. Cl. 463, 501-02 (2008) (noting that because "the only other available relief—the potential for recovery of bid preparation costs—would not compensate [the protestors] for the loss of valuable business . . . loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm").  Accordingly, Plaintiff has adequately demonstrated that it will suffer irreparable harm if injunctive relief is not provided.

## 2.  Balance of Hardships

In addition to considering whether a protestor would suffer an irreparable injury absent injunctive relief, the Court must determine whether the balance of hardships to the government and Defendant-Intervenor in issuing an injunction outweigh the harms to Plaintiff. *PGBA, LLC*, 389 F.3d at 1229. Here Plaintiff has established irreparable harm, as explained above. The government asserts it will be harmed by the additional costs of extending the bridge contract to Plaintiff to maintain the Army's current travel management services contract until the award of the travel contract at issue here is resolved. Gov.'s Resp. at 38. Defendant-Intervenor claims it has incurred costs as a result of the delays related to this bid protest and will continue to incur greater costs if an injunction is issued. BCD Travel's Response at 16–17. However, neither the harm asserted by the government nor Defendant-Intervenor outweighs the harm to Plaintiff. The government's failure to properly evaluate the quotes was detrimental to Plaintiff's ability to meaningfully compete for the contract. The government cannot now contend that costs stemming from GSA's own failures to follow the requirements of the RFQ and the FAR should prevent the issuance of an injunction. As another judge of this Court recently observed:

> Requiring the government to continue purchasing the services from the incumbent for the interim does not outweigh the irreparable harm to an offeror arising from an agency's own failure to comply with the law in awarding the contract. Further, the resources needed to conduct a proper procurement are only those that should have been employed originally by the Agency. Having to employ these resources again is not a hardship, but an obligation.

*Green Tech. Grp., LLC*, 147 Fed. Cl. at 246 (citation omitted); *see also Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 116–17 (2013) ("[A]ny harm caused to the [agency] by granting a permanent injunction regarding [awardee's] performance of the [] contract is the result of defendant's conduct during the procurement."); *Sheridan Corp. v. United States*, 94 Fed. Cl. 663, 670 (2010) ("From the Court's view, these alleged harms are of the agency's own making."). Similarly, the harm claimed by Defendant-Intervenor is actually due to the government's refusal to stay further performance on the Army travel contract while this protest was pending and, of course, GSA's failure to conduct its evaluation according to the RFQ and the FAR. In other words, the alleged harm suffered by Defendant-Intervenor is due to GSA's improper evaluation, not the Court's issuance of an injunction.

## 3.  Public Interest

Turning to the final factor, the Court finds issuing a permanent injunction will serve the public interest. The Supreme Court has instructed that before a court "employ[s] the extraordinary remedy of injunction," it "should pay particular regard for the public consequences" of so doing. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). It is beyond dispute that "[t]here is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 586 (2010) (citation and internal quotation marks omitted), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011). Moreover, "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA, LLC*, 57 Fed. Cl. at 663. It is

32

paramount that GSA—as with any agency—abide by the terms of its RFQ and the FAR in order to maintain public confidence in the procurement process.  Accordingly, this factor likewise weighs in Plaintiff's favor.

### 4. Weighing of the Factors

In addition to prevailing on the merits of its protest, Plaintiff has established that it will suffer irreparable harm if the Court does not provide injunctive relief, that the balance of harms turns in its favor, and that awarding injunctive relief is clearly in the public interest. Accordingly, the issuance of a permanent injunction is warranted.

### CONCLUSION

For the reasons set forth above, the Court **GRANTS** Plaintiff judgment on the administrative record and further orders that:

1. The United States, by and through the General Services Administration, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from continuing to obtain performance from BCD Travel on the contract awarded to BCD Travel pursuant to the RFQ at issue in this protest;

2. Any re-evaluation of quotes received under the RFQ at issue in this protest shall be performed in a manner that is consistent with this opinion;

3. The parties shall confer to determine agreed-to proposed redactions to this opinion.  On or before **July 16, 2021**, the parties shall file a joint status report indicating their agreement on proposed redactions, attaching a copy of those pages of the Court's opinion that contain proposed redactions, with all proposed redactions clearly indicated; and

4. The Clerk shall **ENTER** final judgement accordingly.

**IT IS SO ORDERED.**

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge